Carl JACKSON, Plaintiff–Appellee, Cross Appellant,

v.

CITY OF ALBUQUERQUE, Orlando Sedillo, and Kiki Saavedra, Defendants–Appellants, Cross Appellees.

Nos. 87–2403, 87–2497.

United States Court of Appeals, Tenth Circuit.

Nov. 21, 1989.

Carl J. Hartmann, III, Hartmann & Ruskin, Cedar Crest, N.M., for plaintiff-appellant.

Paula Forney, Asst. City Atty., (Kim Kaufman Michel, Asst. City Atty., and James H. Foley, City Atty. with her on the brief), Albuquerque, N.M., for defendants-appellees.

Before MOORE and ANDERSON, Circuit Judges, and BROWN,* Senior District Judge.

WESLEY E. BROWN, Senior District Judge.

This is an employment civil rights action in which the plaintiff-appellant, Carl Jackson, a black employee of the city of Albuquerque, New Mexico, complained of racial discrimination and retaliation in violation of 42 U.S.C. Section 1981, a violation of due process of law in connection with the termination of his employment, in violation of 42 U.S.C. Section 1983, and an unlawful conspiracy which violated 42 U.S.C. Section 1985. In addition to the city, the defendants-appellees are Orlando Sedillo, Director of the Parks and Recreation Department of the city of Albuquerque, and Henry "Kiki" Saavedra, Superintendent of Adult Sports for the city's Recreation Department, and the immediate supervisor of plaintiff Carl Jackson.[1]

A jury returned a verdict in favor of plaintiff against the three defendants, the city, Sedillo, and Saavedra, finding that they had deprived Jackson of due process of law in violation of the Fourteenth Amendment to the Constitution; that defendants had retaliated against plaintiff because he filed a complaint with the EEOC;

---

* The Honorable Wesley E. Brown, United States District Senior Judge for the District of Kansas, sitting by designation.

1. Linda Misanko, a co-worker in the Sports Department, was also named as a defendant, but a verdict in her favor was directed by the trial court.

that defendants had caused Jackson's termination because of his race, and/or because he had filed a discrimination complaint; and that Jackson had been subjected to discriminatory treatment in employment because of his race, or because he had filed a discrimination complaint.[2] The jury assessed damages against all defendants in the sum of $70,000 and, in addition, awarded punitive damages of $40,000 against defendant Sedillo and $30,000 against defendant Saavedra.

Following trial, the district court considered plaintiff's motion for attorney fees and for reinstatement to his employment with the city and defendants' motions for judgments notwithstanding the verdict, for new trial, and for remittitur. 715 F.Supp. 1048. The trial court found that there was substantial evidence in the case to support the jury's verdict and the amount of damages awarded and overruled defendants' motions.

The trial court further awarded plaintiff "front pay" for two years at the rate of $50,000 per year but denied plaintiff relief in the form of reinstatement to his former position because of "hostility far too high to make reinstatement a feasible remedy in the case." Plaintiff was awarded total attorney fees against the city in the sum of $45,311.50.

All parties have appealed from various aspects of the trial court's orders and judgments. The defendants contend that the evidence was insufficient for the jury to find that plaintiff had been retaliated against or terminated because of his race, or that plaintiff was subjected to disparate treatment because of his race, or that plaintiff was deprived of due process of law. It is defendants' position that plaintiff's case "consisted solely of (his) own subjective, self-serving statements," and that defendants established "through overwhelming evidence" that plaintiff's discharge was based upon legitimate reasons. Defendants also contend that the trial court erred in awarding plaintiff two years of front

pay because there was no evidence that plaintiff would require such an award in order to find comparable employment.

The sole issue raised by plaintiff in this appeal is the refusal of the trial court to order reinstatement of plaintiff to his employment with the city of Albuquerque.

Since defendants have questioned the sufficiency of the evidence to support the verdict, we have reviewed that evidence, as we must, in the light most favorable to plaintiff and the jury verdicts. Following such review, we find that there was sufficient evidence to support those verdicts in all respects.

Under the testimony and other evidence, the jury was entitled to find these following facts:

Plaintiff Jackson obtained his undergraduate degree in Recreation from the University of New Mexico in 1968 and his M.S. degree in Counseling Psychology from that university in 1971. In 1974, he began part-time work for the city of Albuquerque, starting off in the Parks and Recreation Department as a softball umpire and also supervising some of the softball complexes and basketball facilities during the fall and winter. He also worked with the summer food program sponsored by the city. Meanwhile, plaintiff was also employed full time at night at the Juvenile Detention Home. In July, 1977, plaintiff was put on full-time employment with the city as an Assistant Athletic Director of Adult Sports and began to reorganize the program which was then described as being in a "chaotic condition." As a result of plaintiff's efforts, by 1981 the sports program was nationally recognized as a superior program, and plaintiff received numerous letters of commendation and appreciation from civic groups and the mayor, including a memo from defendant Sedillo which recognized his superior performance. There were no negative evaluations to be found in plaintiff's official personnel file and, in evaluations by plaintiff's immediate supervisor, Toby Espinosa, plaintiff was recog-

---

**2.** The cause of action for conspiracy under 42 U.S.C. Section 1985 was dismissed on directed verdict at trial.

nized for the quality of his work, his integrity and willingness to put in long hours.

The evidence established that plaintiff was a rigid and very strict supervisor. He instituted written procedures for the treatment of clients, use of leave time, accounting for funds, and he established a dress code for people within his department, requiring them to present themselves in a professional manner. His habit of strict and close supervision of employees resulted in some resentment by those working under him for it appears that plaintiff was quick to terminate or transfer employees when he believed they were not competent to handle their assigned duties.

Several of plaintiff's associates testified as to his superior performance as a supervisor. Rudy Trujillo, a section head in the Sports Services Division who worked under plaintiff, testified that he rated plaintiff at a "9" out of a possible "10" as a supervisor. (Vol. V, Trans. p. 445). The nutritionist who handled the summer lunch program under plaintiff's supervision testified that he was professional and very strict, but that she had worked for him without any discipline problems and, that over a period of 5 to 6 years, she had never seen plaintiff engaged in "anything that (she) would consider to have any sexual connotation or be sexually harassing in any way to any women." (Vol. 5, Trans. pp. 478–479). Another witness—a member of the public—who had considerable contact with the Sports Department, testified that plaintiff "was very professional ... He wanted things done in the proper way, and at the proper time when they should be. He was a very good administrator, that I could see." (Vol. 5, Trans. p. 488).

Another witness, a clerk-typist who had worked under plaintiff's supervision for four or five years, testified that plaintiff treated her in a professional manner and that she had never observed plaintiff sexually harassing anyone. (Vol. 5, Trans. pp. 496–497).

A former personal secretary for plaintiff, who was also his clerical supervisor for the Sports Division, testified that plaintiff "absolutely (did) not" sexually harass her in any manner. (Vol. 5, Trans. p. 536).

The defendant Kiki Saavedra, plaintiff's immediate supervisor, testified that in June, 1983, he personally rated plaintiff at "49" on a total scale of "50," giving plaintiff the highest credit in the area of "effective interpersonal relationships." In July, 1984, he rated plaintiff at a "46" out of "50"—still a good to excellent rating, giving plaintiff the highest points in 7 out of 10 classifications. In this evaluation, plaintiff received his lowest score—a "3" out of a possible "5"—in the area of "personal relationships." This was one month after plaintiff had sent a memorandum of complaint to defendant Sedillo. Plaintiff was not rated in 1985 because he had been placed on leave of absence. (Vol. 4, Trans. pp. 391–397).

At the time of plaintiff's termination, he supervised 120 to 150 full and part-time employees, he had developed a strong amateur boxing program in addition to the softball and basketball programs, and the department operated a lunch program with a one million dollar budget, serving lunches at 100 sites. Up until 1980–1982, plaintiff worked with the city administrators without problems. In 1980, plaintiff drafted a proposal to develop the Adult Sports Program into its own division, together with the summer food program, and he presented it to defendant Sedillo, Director of the City Parks and Recreation Department. At that time, he was told that "political circumstances" made it "infeasible" for plaintiff to become superintendent of a department because he was black and that "politically and socially, it wasn't feasible for (plaintiff) to become a superintendent." Sedillo did promise at that time to put additional activities within plaintiff's department and paperwork was started to augment the status of the Adult Sports Program, and plaintiff was promoted to Assistant Superintendent of Adult Sports.

In 1982, plaintiff's situation began to deteriorate. Plaintiff's department was subjected to what could be found to be "unusual" audits, "anonymous" complaints were received from unnamed and unidenti-

fied "concerned citizens," non-merit promotions were given to non-blacks, and plaintiff was by-passed in several instances during administrative meetings and planning councils. In March, 1984, plaintiff made a written complaint to the defendant Kiki Saavedra, his immediate supervisor. He complained that he had been given the lowest pay grade scale for an administrator; he complained about the lack of opportunities; the non-posting of job circulars; and the manner in which people were selected for advancement. Plaintiff also complained that his staff had not been given the recognition they deserved, and he requested that they be reviewed for possible upgrades and pay reclassification. At that time, plaintiff also complained of what he perceived to be personal harassment. Defendant Saavedra responded to this complaint by suggesting that plaintiff get a lawyer or talk with someone else about his problems.

Soon after plaintiff filed this written complaint, additional instances of retaliation and harassment began. Prior to that time, plaintiff had received permission from the department to serve as a representing agent for a sporting equipment company because it would be advantageous for participants in the sports program. Four days after plaintiff filed his complaint, this permission was revoked. Plaintiff had served a copy of his complaint upon the city's Affirmative Action Officer, Leon Boyden. Defendant Sedillo was very angry and met with this officer regarding plaintiff's complaint. Sedillo then wrote a memo to plaintiff, dated June 5, 1984, accusing him of sexual harassment of women employees. This memo mentioned reports of two temporary employees who had been terminated by plaintiff because of deficient performances and an alleged "suggestive" telephone conversation plaintiff had with a worker in the mayor's office in *1980*, and another sexual harassment complaint which was made in *1980*. Defendant Sedillo also threatened plaintiff with the police

if "anything happened" to any of the people mentioned in the memo.

By this time, plaintiff had legal counsel and an appropriate response to Sedillo's memo was made with a request that the Sedillo memo be expunged from all public record. A meeting was arranged with the Chief Administrative Officer of the city and defendant Sedillo where plaintiff had an opportunity to present his version of the incidents in question. At that time, plaintiff also complained of the conditions whereby black employees were treated in a manner different from Hispanic employees of the city. An agreement was reached that the Sedillo memo was inappropriate and that it should be expunged from all of plaintiff's employment records. Plaintiff followed up on this and was assured that the memo had not been placed in his personnel file.

Further incidents followed. Plaintiff was left out of policy-making meetings, questions about operation of his department were directed to his assistants and not to plaintiff, another employee was chosen to preside at inaugural ceremonies for a new softball field, and another of plaintiff's assistants was put in charge of the division when defendant Saavedra and plaintiff's supervisor, Espinosa, were out of town. In addition, and unknown to plaintiff at the time, the defendant Sedillo attempted to have plaintiff investigated on a personal basis by the city police department at least three times until the police finally refused to cooperate in the matter. The subject matter of the investigation was not work related.[3]

When the retaliatory behavior continued, plaintiff filed a complaint with the Federal Equal Opportunity Commission. Immediately after this, untrue memos from defendant Saavedra were written accusing plaintiff of being away from his job and Jackson was publicly reprimanded and told to "stop complaining" at a staff meeting in December, 1984. There was evidence that plain-

---

**3.** Deputy Police Chief Sam Baca told plaintiff that "he was aware that Mr. Sedillo had requested these investigations and that he thoroughly laundered me and found that there were prob-

lems and that they had instructed Mr. Sedillo that their problem with Carl Jackson was an internal problem and not to use the police anymore." (Trans. 101)

tiff voluntarily attended, on his own initiative, a sexual harassment prevention training seminar shortly after this staff meeting. Plaintiff attended this seminar with two female secretaries in his office and, in January, 1985, held a staff meeting with his assistants to discuss the seminar. About this time, plaintiff learned that Sedillo had requested a police investigation of his personal life.

At this time, plaintiff employed a male secretary but, in March, 1985, against his wishes, his secretary was switched to Central Services, and plaintiff was provided with a female secretary, one Martha Marquez. Ms. Marquez proved to be an unsatisfactory worker, but plaintiff's request that his male secretary be returned to him was denied during a June 12, 1985, meeting with Jackson's superiors. Rick Giron, one of plaintiff's assistants, kept notes on Marquez's poor performance and plaintiff ultimately recommended her termination.[4]

During the week of June 17, 1985, an EEOC federal investigator came on site to examine city officials regarding plaintiff's discrimination complaint. One Valdez, the Assistant Director of Parks and Recreation and the immediate subordinate to defendant Sedillo, was the principal contact for the meetings with the federal examiner. The day after the EEOC investigator appeared, Valdez told Martha Marquez that plaintiff was trying to fire her but that city officials were on her side. Marquez then made two complaints of sexual harassment against plaintiff—one that plaintiff had hit her backside with a plastic garbage bag months previously and that once, when she bumped into him, he apologized in a way that she alleged sounded suggestive. Marquez admitted that she had never spoken to plaintiff about these incidents and that she had not before made any official complaint. One witness testified that Marquez had later told her that she, Marquez, had "gotten to Carl Jackson on a sexual harassment charge." (Vol. 5, Trans. p. 535)[5]

On July 25, 1985, two days after Ms. Marquez had filed her complaint, plaintiff was called into Saavedra's office and handed a memo putting him on administrative leave. He was not told of Ms. Marquez's complaint and he was not told why he was put on administrative leave.

Under the evidence, the jury could find that the defendants Sedillo, Saavedra, and Sedillo's assistant, Valdez, then set up a sham "investigation committee" headed by Valdez to look into "charges" against plaintiff and that they proceeded to solicit witnesses against plaintiff, including testimony from various women who believed they had been sexually harassed by plaintiff, relating incidents dating back to 1979–1980.[6] This committee failed to follow any of the administrative procedures or guide-

---

**4.** City Services refused to accept Ms. Marquez back. Plaintiff was told "that if we didn't like Martha Marquez, then our only alternative was to terminate her, and along with that, he threatened (plaintiff) by saying that her mother was high up in the city, and if (plaintiff) attempted to terminate her, (plaintiff) would find (himself) in trouble taking no notice of that threat." Plaintiff however instructed his assistant, Giron, to process her termination. (Vol. III, Trans. p. 111).

**5.** Papers terminating Ms. Marquez were returned to plaintiff's office with a note that the only way she could be terminated was with the consent of Saavedra, Valdez and Sedillo, and they would not agree to terminate her.

**6.** Plaintiff testified that it was his management style to use "terms of endearment" with both men and women, such as "sweetheart" and "baby," and that he frequently touched or put his arm around the shoulder or waist of all employees, both men and women during con-

versations and so forth and that not once, during the entire time he had worked at Parks and Recreation had one employee, male or female, ever complained to him about sexual harassment. With reference to the specific complaints made to the investigative committee, plaintiff either denied that they occurred or testified that the incidents were innocent in nature. For instance, with reference to the complaints of Ms. Marquez, plaintiff admitted that they had accidentally bumped into one another from the rear, but that he had thought nothing of it, and he denied that he had ever swatted her on her backside with a plastic trash bag. The jury was entitled to find that the incidents related by other women had either not occurred or that they were innocent encounters devoid of the sexual connotations perceived by the women employees. Most of the women who complained had been fired or terminated by plaintiff.

lines set up by the city for handling termination investigations and, in particular, failed to limit evidence of misconduct to incidents occurring no more than 180 days prior to such hearing. Of particular significance is the fact that Sedillo and Saavedra presented to this committee Sedillo's memo of June 5, 1984, regarding sexual harassment of temporary workers in 1980, which is the memorandum which was to have been expunged from plaintiff's personnel record.

In contrast to the treatment accorded to plaintiff, the jury heard evidence that a male Hispanic employee, one Espinosa, also an Assistant Superintendent in Sports, had had five complaints filed against him for sexual harassment involving physical force used to gain sexual favors and advantages from women. This employee had not been disciplined for his actions, and he had in fact been promoted to a superintendent position—the position that plaintiff had been requesting since 1980. There was also evidence that another Hispanic employee, defendant Saavedra, "as a matter of behavior" and "because he was a politician," hugged and kissed every woman he came into contact with, calling them "sweetheart" and "baby," without being reprimanded.

After plaintiff received the memo putting him on administrative leave, he remained at home for over three weeks, waiting for information as to why he had been suspended. When he received a call from Valdez reporting that the committee had heard evidence in his case, and it was time for him to appear before the committee, he did appear, but upon advice of counsel, he read a prepared statement to members of the committee and refused to participate further because of his belief that the proceedings were illegal since the investigation had not been conducted according to administrative guidelines.[7] At the time plaintiff appeared before the committee, he had not been advised of the specific nature of the complaints against him and he did not learn the specifics of Ms. Marquez's complaint until a hearing several months later.

The committee recommended that plaintiff be terminated. Three grounds were stated—sexual harassment; "frustrating managers' opportunity to complain through channels"; and the failure to pay a part-time employee overtime. The two latter charges were dropped when the matter proceeded to the Personnel Review Board on appeal. The board, relying on the "evidence" gathered, was evenly split 2 to 2 as to whether plaintiff should be terminated, and so the recommendation of the committee was adopted and plaintiff was officially terminated.

We have recited the factual background of this case at some length for the purpose of showing that plaintiff did in fact present sufficient evidence to support the jury verdict. The trial court so found in its post-trial memorandum denying defendants' motion for judgment notwithstanding the verdict or for new trial: (Vol. I, Record on Appeal, Item 81)

There is little discretion allowed a court in considering a motion for judgment n.o.v. "The motion for judgment n.o.v. may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment." *5A Moore's Federal Practice*, Section 50.-07(2) (1986). Further, the evidence is to be viewed in the light most favorable to the party opposing the motion for judgment n.o.v. ... "Only when the evidence points but one way and is susceptible to no reasonable inferences which may sustain the position against whom the motion is made is j.n.o.v. appropriate." *EEOC v. University of Oklahoma*, 774 F.2d 999, 1001 (10th Cir.1985) *cert. denied*, [475 U.S. 1120] 106 S.Ct. 1637 [90 L.Ed.2d 183] (1986) citing *EEOC v. Prudential Federal Savings & Loan Ass'n*, 763 F.2d 1166, 1171 (10th Cir.) *cert. denied* [474 U.S. 946] 106 S.Ct. 312 [88 L.Ed.2d 289] (1985). *There was substantial evidence in this case to support the jury's verdict and I will not disturb it.* Neither would an award of a new trial or remittitur be appropriate in this case....

---

**7.** At this time, plaintiff's counsel also protested the illegal nature of the proceedings.

A new trial is appropriate where the jury verdict is against the weight of the evidence, the damages are excessive or the trial was not fair to the moving party ... The standard required for a new trial is lesser than that for judgment n.o.v. The judge must find that the jury verdict was against the weight of the evidence. *Brown v. McGraw–Edison Co.*, 736 F.2d 609 (10th Cir.1984). However, this does not mean that a judge can substitute his judgment for that of the jury. It must be clear that an erroneous result was reached, *Frank v. Bloom*, 634 F.2d 1245, 1254 (10th Cir.1980), and that the verdict was clearly or overwhelmingly against the weight of the evidence. *Prebble v. Brodrick*, 535 F.2d 605, 617 (10th Cir. 1976). It would be an invasion of the province of the jury to grant a new trial merely because there was a sharp conflict in evidence ... Such is exactly the case here. The evidence was sharply conflicting regarding all the issues defendants address in their motion. It was not clearly or overwhelmingly in favor of either plaintiff or defendants *and I will not disturb the jury's verdict.* The motion for a new trial is denied. (Emphasis supplied.)

It is as clear to us as it was to the trial court that there was a sharp conflict in evidence and the testimony of many witnesses with regard to plaintiff's complaint. This was a classic jury case; the trial court correctly applied the law of this circuit in refusing to disturb the jury verdict, and the order denying judgment n.o.v. and for new trial will be affirmed.[8]

We now turn to plaintiff's claim that the trial court improperly denied him an award of reinstatement to his job with the city of Albuquerque.

The trial court recognized that "(r)einstatement is an element of the remedy for violation of a plaintiff's civil rights," but that "(w)hile reinstatement is the preferred remedy, it is not an absolute right," citing *E.E.O.C. v. Prudential Federal Savings and Loan Ass'n,* 763 F.2d 1166 (10th Cir., 1985) *cert. denied* 474 U.S. 946, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985).[9] The trial court found that, in the case of plaintiff Carl Jackson, "(t)he general hostility remains impossibly high," and accordingly, an award of front pay was given without reinstatement. In reaching this conclusion, the court made these findings:

The hostility was evident in the courtroom, in the unprofessional and derogatory language used by defendants' expert toward the plaintiff and the burglary of plaintiff's file from his attorney's office, as referred to in Mr. Hartmann's affidavit of July 24, 1987. (While I do not suggest by this that defendants themselves are responsible for this burglary, there is obviously great hostility towards the plaintiff on the part of someone who aligned himself, herself or themselves with the defendants which likely would effect (sic) plaintiff's ability to work were he reinstated). It is also evident in the comments made by defendants in the newspapers after the trial and recently in their threatened prosecution of parties unknown in relationship to settlement negotiations. All these factors point to hostility far too high to make reinstatement a feasible remedy in this case. Plaintiff's point that most of the defendants and witnesses no longer work in the Parks and Recreation Department is well taken. However, it is not just with his subordinates that Mr. Jackson would have to associate, but with other agencies and with the public as well. The general hostility remains impossibly high. Accordingly, I will order an award of front pay.

In arriving at this decision, the trial court found the case of *E.E.O.C. v. Kallir, Philips, Ross, Inc.,* 420 F.Supp. 919 (S.D.N.Y. 1976), *aff'd without opinion* 559 F.2d 1203

---

8. The same rule applies as to the jury's determination regarding damages, for, again, the evidence was sufficient to support the award.

9. The *Prudential* case was brought under the Age Discrimination in Employment Act, 29

U.S.C. Section 621, et seq., and it was not a private action under Section 1983. The trial court awarded some future damages but denied reinstatement. The case was remanded for further hearing on why reinstatement was denied.

(2d Cir.) *cert. denied* 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977) to be persuasive.

In *Kallir, a Title VII* and not a Section 1983 case,[10] plaintiff was a senior account executive with an advertising agency who was discharged in retaliation for filing a sexual discrimination complaint with the EEOC. See *Equal Emp. Op. Com'n v. Kallir, Philips, Ross, Inc.*, 401 F.Supp. 66 (S.D.N.Y.1975). In awarding "front pay," but denying reinstatement, the trial court found that the litigation had been "marked by more than the usual hostility between the parties" and that because plaintiff's job required "a close working relationship between plaintiff and top executives" and "frequent personal contact with defendant's clients" a lack of complete trust and confidence between plaintiff and defendant company could "lead to misunderstandings, misrepresentations and mistakes, and could seriously damage defendant's relationship with its clients." *E.E.O.C. v. Kallir, Philips, Ross, Inc., supra*, 420 F.Supp. at 926–27.

While we are reluctant to fault the trial court because of its choice of remedies, we must conclude that the record in this case does not support the denial of reinstatement. In the first place, and as recognized by the trial court, most of those making complaint against plaintiff are no longer employed by the Parks Division of the city. Marty Valdez, the assistant to defendant Sedillo and the head of the investigation committee, retired from his employment on April 1, 1986. Defendant Sedillo left city employment in February, 1987. One of the members of the committee is now in charge of the city's convention center and has no contact with the Park Board.

There was no evidence that plaintiff had any particular problems in dealing with the public. One member of the public testified that he had a dispute with plaintiff concerning money to pay an umpire and this witness and officers of his association were banned from participating in city recreational functions "for life." This person appealed to a higher level, but defendants Sedillo and Saavedra, and Valdez, Sedillo's assistant, supported plaintiff and upheld this ban. It also appeared that the City Attorney had put this association on a different billing arrangement, and that plaintiff himself was not responsible for these difficulties. (Vol. 6, Trans. pp. 752–758).

The record discloses that during the trial a problem arose because of an anonymous letter received by the Office of the City Attorney and that an investigation was being conducted of plaintiff's associates by a private detective and members of the police department. The trial court was assured by attorneys for the defendants they had not instigated this investigation, although they reported that the letter had been sent to the Civil Litigation Division of the Police Department, but with instructions that no one was to be contacted during the trial.

This court has reviewed the testimony of defendants' expert witness, one Trisha Brinkman (Vol. 7, Trans. pp. 860, et seq), without noting any particular personal animosity from this witness towards the plaintiff. In any event, the hostility of an expert witness should carry no weight in determining plaintiff's entitlement to reinstatement. Likewise, there is no evidence *in the record* concerning hostile statements made to the news media after the jury returned a verdict in favor of plaintiff and—in any event—it is not surprising that defendants or other city officials were not pleased with the verdict.

This court has recently spoken on the issue of reinstatement in *Starrett v. Wadley*, 876 F.2d 808 (10th Cir.1989). There, a deputy county assessor recovered damages under Section 1983 for sexual harassment, but was denied front pay or reinstatement because the district court believed that reinstatement and front pay are not mandatory remedies under Section 1983; because plaintiff had found other employment soon after her termination from the assessor's office; because reinstatement would generate hostilities at the office; and because the award of $75,000 made plaintiff whole.

---

**10.** The *Kallir* court noted that under Title VII, 42 U.S.C. Section 2000e–5(g), an award for reinstatement is *entirely* discretionary. See 420 F.Supp. at 926.

While noting that reinstatement is *ordinarily to be granted,* this court upheld its denial in the *Starrett* case because of an affidavit from plaintiff's own expert which stated that reinstatement might be detrimental to plaintiff's health: (876 F.2d at 824)

> Regarding the denial of reinstatement, *we agree with plaintiff that reinstatement usually will be granted when a plaintiff prevails in a wrongful discharge case brought under Section 1983. See, e.g., Reeves v. Claiborne County Bd. of Education,* 828 F.2d 1096, 1101 (5th Cir.1987) ("Reinstatement is also normally an integral part of the remedy for a constitutionally impermissible employment action."); *Allen v. Autauga County Bd. of Education,* 685 F.2d 1302, 1305 (11th Cir.1982) ("(R)einstatement is a basic element of the appropriate remedy in wrongful employee discharge cases and, except in extraordinary cases, is required"). However, plaintiff here submitted an affidavit from a psychologist with her motion for reinstatement stating that reinstatement was not appropriate at that time and would be detrimental to plaintiff's health.... In light of the affidavit of plaintiff's own expert, we conclude that the district court did not abuse its discretion in denying plaintiff's request for reinstatement. *Cf. Fitzgerald v. Sirloin Stockade, Inc.,* 624 F.2d 945, 957 (10th Cir.1980) (denial of reinstatement was appropriate in a Title VII case where there was an atmosphere of hostility).... " (Emphasis supplied.) [11]

In the case cited with approval in *Starrett, Reeves v. Claiborne County Bd. of Educ., supra,* 828 F.2d 1096, a school administrator was demoted because she had testified in litigation brought by teaching assistants against the County Board of Education. The trial court denied her back pay and reinstatement. In reversing this denial, the court discussed the importance of reinstatement to a plaintiff who had lost employment or who had been demoted in violation of her constitutional rights: (828 F.2d at 1101–02)

> The equitable remedy of back pay is required in the context of adverse personnel actions which occur as retaliation for the exercise of first amendment freedoms ... An award of back pay is required when an adverse personnel action instituted for constitutionally impermissible reasons results in a loss of wages, regardless of whether the employee "accepted" the payments received in the demotion.

> Reinstatement is also normally an integral part of the remedy for a constitutionally impermissible employment action.... Although reinstatement is not "absolute and automatic," it is clear that "once the plaintiff establishes that his discharge resulted from constitutionally impermissible motives, he is *presumed* to be entitled to reinstatement...." (Emphasis of the court).

> The district court gave two reasons for denying appellant the preferred remedy of reinstatement. First, the court found that a successor to Mrs. Reeves had been hired during the course of litigation. We find this justification for denying reinstatement unpersuasive. If the existence of a replacement constituted a complete defense against reinstatement, then reinstatement could be effectively blocked in every case merely by hiring an innocent third party after the retaliatory purpose was achieved. Thus, the deterrent effect of the remedy of reinstatement would be rendered a nullity.... While reinstatement may displace an innocent employee, the "(e)nforcement of

---

11. In *Fitzgerald v. Sirloin Stockade, Inc.,* 624 F.2d 945, a Title VII case, the plaintiff did not request reinstatement, but instead, began work with another company at a salary of $1,000 per month and she expressed no desire to give up that job and return to defendant's employment. This court held that the denial of reinstatement was supported by the record. In *E.E.O.C. v. General Lines, Inc.,* 865 F.2d 1555 (10th Circuit 1989), also a Title VII case, relief by reinstatement of two store clerks was denied. On appeal this court held that the jury's back pay award fully compensated the clerks because at trial both clerks were residing outside the state and neither gave any testimony that they wished to be reinstated to their jobs at the liquor store. It also appeared that there would be "friction" if the clerks returned to their jobs.

constitutional rights (may have) disturbing consequences. Relief is not restricted to that which would be pleasing and free of irritation." *Sterzing v. Fort Bend Ind. School Dist.*, 496 F.2d 92, 93 (5th Cir.1974).... The second rationale advanced in refusing reinstatement was that Dr. Noble's recommendation to transfer Reeves was only *partly* motivated by constitutionally impermissible considerations.... To deny reinstatement because Noble voiced other reasons to transfer Reeves in order to convince the Board to approve her reassignment would give credence to deception.... The failure to order reinstatement on these facts is clearly erroneous.

In another case cited in the *Starrett* opinion, *Allen v. Autauga County Bd. of Educ.* (11th Cir.1982), 685 F.2d 1302, non-tenured school teachers' contracts were not renewed because of a letter addressed to the state superintendent of education regarding use of school funds. Suit was filed under Section 1983 for damages, back pay, reinstatement and attorney fees. Damages were awarded, but reinstatement was denied because it would "breed difficult working conditions" and because there was a "lack of mutual trust between (the teacher) and (principal) which is essential in the operation of a school." On appeal, this ruling was reversed with a citation to *Sterzing v. Fort Bend Independent School District, supra,* 496 F.2d 92 (5th Cir.1974) a Section 1983 case, which remarked:

> In declining to grant reinstatement on the basis that it would be too antagonistic, the Court used an impermissible ground. On the hypothesis of a violation of his First and Fourteenth Amendment rights ... the Court could not deny relief on such basis. Enforcement of constitutional rights frequently has disturbing consequences. Relief is not restricted to that which will be pleasing and free of irritation. (496 F.2d at p. 93).

In finding that reinstatement "is a basic element of the appropriate remedy in wrongful employee discharge cases and, except in extraordinary cases, is required," the *Allen* court explained the necessity for reinstatement in the following manner:

> "This rule of presumptive reinstatement is justified by reason as well as precedent. When a person loses his job, it is at best disingenuous to say that money damages can suffice to make that person whole. The psychological benefits of work are intangible, yet they are real and cannot be ignored. Yet at the same time, there is a high probability that reinstatement will engender personal friction of one sort or another in almost every case in which a public employee is discharged for a constitutionally infirm reason. Unless we are willing to withhold full relief from all or most successful plaintiffs in discharge cases, and we are not, we cannot allow actual or expected ill-feeling alone to justify nonreinstatement. We also note that reinstatement is an effective deterrent in preventing employer retaliation against employees who exercise their constitutional rights. If an employer's best efforts to remove an employee for unconstitutional reasons are presumptively unlikely to succeed, there is, of course, less incentive to use employment decisions to chill the exercise of constitutional rights." (685 F.2d at 1306).

Contrary to the situations found in *Fitzgerald v. Sirloin Stockade, supra,* 624 F.2d 945, and *E.E.O.C. v. General Lines, Inc., supra,* 865 F.2d 1555, the plaintiff here has always sought reinstatement to his former position with the city of Albuquerque. Due to the nature of his training and experience, comparable positions are not quickly or easily found.[12] The hostility perceived by the trial court appears to be all one-sided and on the part of officials now removed from city employment, disgruntled fellow workers, unknown persons who send anonymous messages to the City Attorney or statements appearing through

---

**12.** Plaintiff testified that he had been told by prospective employers that his application could not be considered until this case had been concluded.

the media.[13]

Our review of the evidence reveals that certain parties, including the named defendants within the city administration, were determined to run plaintiff Carl Jackson off the job. If he is denied reinstatement, they will have accomplished their purpose.[14] While some might wonder why plaintiff would want to return to a hostile working environment, we recognize, as did the court in *Allen v. Autauga County Bd. of Education, supra,* that sometimes money alone cannot make a person whole. Actual or expected ill-feeling cannot justify denial of reinstatement here. "If an employer's best efforts are presumptively unlikely to succeed, there is, of course, less incentive to use employment decisions to chill the exercise of constitutional rights." *Allen v. Autauga County Bd. of Educ., supra,* 685 F.2d 1302 at 1306.

As noted, the source of all of the hostility present in this particular case appears to stem from persons within the city administration. There is no evidence that plaintiff himself has ever taken any action which would exacerbate the situation other than his lawful filing of a complaint with the E.E.O.C. and the retention of legal counsel to guide him through the administrative hearings and appeal from the notice of termination. There is no evidence that plaintiff's position as an Assistant Superintendent in the Adult Sports Department of the Parks and Recreation Division of the city of Albuquerque would require any special or sensitive type of personal confidence or a personal loyalty and mutual trust between plaintiff and his superiors, the absence of which might jeopardize the conduct of the city's affairs. *Cf. E.E.O. v. Kallir, Philips, Ross, Inc., supra,* 401 F.Supp. 66, and 420 F.Supp. at 926, where the court found that a senior account executive, working directly under the president and vice-president of an advertising agency, had a job which required such a close working relationship in dealing with the firm's principal client.

For these reasons, and under the special circumstances of this case, we therefore find that plaintiff was entitled to the relief he requests—that is—reinstatement to his former position with the city of Albuquerque, together with all increments in pay and position which he would have achieved if he had not been terminated. He is also entitled to the damages awarded by the jury, all back pay to which he may be entitled to up to the date of his reinstatement, and the attorney's fees and costs heretofore awarded by the court and an award for additional fees and expenses arising during remand. Since we are not aware of plaintiff's current employment situation, this case will be remanded to the district court for a further hearing on the amount of back pay due to plaintiff, taking into account any sums plaintiff may have earned in the interim which may be offset against such award. The trial court shall also hear and consider such evidence as may be necessary in setting the terms and conditions of plaintiff's reinstatement to his former position.

Plaintiff has also requested an award for attorney's fees, expenses, and costs on this appeal. Since this case is being remanded for further hearing and appropriate orders, plaintiff's request for such an award will be denied at this time. When the matter is fully determined in the trial court and in any subsequent appeal which may arise, plaintiff may again petition for such costs, fees and expenses. Accordingly,

The order and determination of the trial court insofar as it denies plaintiff reinstatement to his former position with the city of Albuquerque is REVERSED. The case is remanded to the United States District Court for determination of back pay to plaintiff, award of additional fees and costs if any, and an order determining the terms

---

13. The content of such media statements is not a part of the record in this care—and plaintiff had no opportunity to present any evidence on this issue.

14. It appears that the jury even inquired as to whether or not it could award plaintiff *additional relief by* reinstatement to his job.

and conditions of plaintiff's reinstatement with the city of Albuquerque.[15]

15. Defendants have filed a Motion for Additional Briefing, citing the recent Supreme Court case of *Patterson v. McLean Credit Union,* 491 U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132, which construed 42 U.S.C. § 1981, and the case of *Jett v. Dallas Independent School District,* 491 U.S. ——, 109 S.Ct. 2702, 105 L.Ed.2d 598, which discussed the respondeat superior theory of vicarious liability. The court has considered these opinions and finds they do not affect either the analysis or outcome of this case. The Motion is denied.