Phillip W. THORNTON, Plaintiff,

v.

Sheila KAPLAN; Joan M. Foster; R. Michael Brown; Virginia Parker; David Skougstad; Larry Lombard; Nancy T. Frontczak; James Fleming; Anne Steinbeck; Aimes C. McGuiness; John Roybal; Harriet Barker; George Brantley and Metropolitan State College of Denver, Defendant.

No. 95–WY–1520–AJ.

United States District Court, D. Colorado.

Dec. 23, 1996.

Paul Anthony Baca, Denver, CO, for plaintiff.

Gregory A. Eurich, Holland & Hart, L.L.P., U.S. District Court, Denver, CO, William J. Higgins, Attorney General's Office, Tort Litigation Section, Denver, CO, for Sheila Kaplan, Joan M. Foster, Virginia Parker, Larry Lombard, Nancy T. Frontczak.

Gregory A. Eurich, Holland & Hart, L.L.P., U.S. District Court, Thomas J. Lyons, Cathy H. Greer, Hall & Evans, U.S. District Court, William J. Higgins, Attorney General's Office, Tort Litigation Section, Denver, CO, for Sheila (I) Kaplan, Joan (I) M. Foster, Virginia (I) Parker, David (I) Skougstad, Nancy (I) T. Frontczak.

William J. Higgins, Attorney General's Office, Tort Litigation Section, Denver, CO, for R. Michael Brown, David Skougstad, James Fleming, Anne Steinbeck, Aimes C. McGuinness, John Roybal, Harriet Barker, George Brantley, Metropolitan State College.

Thomas J. Lyons, Cathy H. Greer, Hall & Evans, U.S. District Court, Denver, CO, for Michael Brown, Larry (I) Lombard.

## ORDER DENYING REINSTATEMENT AND AWARDING FRONT PAY

ALAN B. JOHNSON, Chief Judge.

The plaintiff's request for reinstatement with tenure as a professor at Metropolitan State College of Denver came before the Court for hearing on November 25, 1996. Counsel for the parties appeared, presented evidence and their arguments with respect to plaintiff's request on the remaining equitable issues that must be decided by this Court following the jury trial held earlier in this matter.

At the hearing, plaintiff testified that he seeks reinstatement with tenure. He stated that he had "earned tenure" and requested the Court to order reinstatement with tenure effective in January 1997. He is ready, willing and able to return to work as soon as possible. He did express some concerns about returning to his former position at MSCD. These included the fact that, to date, MSCD and its representatives have not yet indicated to his satisfaction that any wrongdoing occurred in this case and that Virginia Parker, the person with whom he seems to have had the greatest difficulties, has not been disciplined or reprimanded. He expressed concerns that other faculty members who testified on his behalf may be retaliated against for giving their support to plaintiff. Plaintiff stated simply that he does not trust at all the present administration at the college. He testified that this did not present an especially great problem for him, however, because teachers function with a great deal of independence and are not required to interact extensively with the administration and that he got along well with the students and others with whom he would have come into contact on a regular basis.

Plaintiff is presently 54 years of age. Accounting is a second career for him, after he had engaged in farming until he was approximately 39 or 40 years old. He began his academic accounting career in Arkansas and is a certified public accountant in Arkansas, although he indicates he has never engaged in any private accounting practice in any state. When his wife made a career move to Texas, plaintiff followed her to Texas and began work on his Ph.D. in accounting. He left Texas to come to MSCD to teach in 1990; his wife joined him in Colorado about one year later. When plaintiff came to MSCD in 1990, he had not at that time completed his doctorate and was hired "ABD" (all but dissertation). From 1990 on, plaintiff was hired by MSCD under one year successive con-

tracts for the ten month academic year, and also had separate summer contracts.

Plaintiff testified that he had intended to stay at MSCD 20 years, that he had come to the school at age 50, and that staying 20 years would make a significant difference in his retirement. He noted that MSCD does not have a mandatory retirement age, so he believed his expectations of staying a long time were not unrealistic. He also testified that he expected to be promoted during that time. Plaintiff had incurred out of pocket expenses (in addition to back pay awarded to him by the jury) for medical coverage on his wife's health insurance plan, in the amount of $67.00 per month as of July 1, 1996.

Plaintiff was questioned about efforts to obtain other comparable employment in his field. He indicated that he had not applied for any college positions since he had been denied tenure. He indicated additionally that he was certified as a certified public accountant in Arkansas, but that he had not taken steps to transfer that certification to Colorado. With respect to possible employment in the private sector, plaintiff stated his belief that younger students coming out of college were more marketable than he and that he did not have any practical experience that made him marketable in that area. He indicated that he was not qualified to work as a practicing CPA without additional training and that he had no practical accounting experience. Plaintiff indicated, at the hearing, that he had accepted a temporary accounting position in a private business, pending the outcome of the instant litigation. Plaintiff stated that he did not anticipate finding another academic position comparable to his position at MSCD within a short period of time, if at all, giving consideration to the job market and the significant competition for existing jobs that might be available to him.

█ Evidence was presented at the hearing about what an appropriate front pay award might be, in the event that this Court determined reinstatement was not a feasible remedy in this case. The evidence submitted to the Court by the parties included the depositions of Patricia Pacey, Dean Michael Brown, Alison R. Hess and Sharon K. Brougham, as well as the testimony of the defendants' economic expert, Dr. Samuel T. Battaglia.

Defendants also offered the testimony of Dr. Sheila Kaplan at the hearing, with respect to both the reinstatement issue and front pay issues being heard at the November 25, 1996 hearing. Dr. Kaplan testified that she believed reinstatement was not a feasible alternative in this case. She expressed the opinion that if the Court required the tenure application process to begin anew, many of the faculty members might be reluctant to participate in that peer evaluation process or to be involved in the process whatsoever. She thought this litigation might have a chilling effect on participation in that process. She stated that if there were no material changes in plaintiff's dossier, her decision with respect to plaintiff's tenure application would not change and that she would still recommend that plaintiff be denied tenure, based on her independent assessment of his qualifications and his plans for future teaching and research. She expressed her opinion that reinstatement would be detrimental to the college and that plaintiff could not be reasonably expected to work in the collegial manner expected of faculty members.

The deposition testimony received at the hearing related primarily to matters affecting the determination of an appropriate front pay award if reinstatement is not ordered. In her deposition, Sharon Brougham indicates she was a professor at MSCD from 1982–1985. She also had a small private tax practice. She returned to MSCD in 1991, on the tenure track, while still working on her Ph.D. Her contract was not renewed in 1995, when she failed to obtain her Ph.D. She describes her search for other employment, noting that she applied for five jobs advertised in the Rocky Mountain news, and that within two weeks of May 12, 1995 when she left MSCD, she had obtained other employment at $43,000 per year.

The Alison Hess deposition indicates that she was an accounting professor at MSCD whose contract was (involuntarily) not renewed in May of 1996. She indicates that she started looking for other employment in January of 1995, was offered a job with a Big

6 accounting firm by Easter of that year at the same rate of pay she had at MSCD and that she began her new employment in May of 1995. She holds a J.D. degree and a Masters in Accounting. Defendants conceded that Ms. Hess's situation was "not the same as plaintiff's."

Dean Brown's deposition indicates that the average retirement age at MSCD is 62 and that the average retirement age in the School of Business is 61.4 years. Professors have 10 month contracts with the school (September to June) for the academic year; some but not all have separate summer contracts. He explains that the tenure process is separate from, but similar to, the promotion process. His deposition includes the results of a salary parity survey done by MSCD comparing its salaries to comparable schools (Exhibit C-5). Additionally, Exhibit C-6, provides a summary of listings from the Chronicle of Higher Education of academic positions listed over the past two years, disclosing that for academic year 1995-96 there were four accounting positions announced at institutions in Colorado; for 1996-97, 7 positions were announced in Colorado. Dean Brown's deposition testimony also discusses his concerns about reinstatement of plaintiff in the circumstances of this case.

The defendant's economist, Dr. Samuel T. Battaglia, offered evidence intended to project plaintiff's future economic losses in two areas: as a practicing CPA accountant in the private sector and as a professor. He projected plaintiff's earnings over his work life to age 65, assuming that it would take approximately one year to plaintiff to obtain other suitable employment, and using a discount rate of 2%. He projected plaintiff's lost earnings and benefits, in present value based upon two scenarios. Exhibit C-8. The first scenario assumes that plaintiff finds alternative employment as a professor in this geographical area at a lower starting salary than he was earning at MSCD. In that scenario, Dr. Battaglia concludes:

| | |
|---|---|
| wages at MSCD | $574,200 |
| less alternate wages | 489,000 |
| net wage loss | 85,200 |
| fringe benefits lost | 12,800 |
| NET FRONT PAY | $ 98,000 |

In the second scenario, Dr. Battaglia assumes plaintiff will obtain employment as a CPA in the private sector. In this scenario, he concludes:

| | |
|---|---|
| wages at MSCD | $574,200 |
| less alternate wages | 366,800 |
| net wage loss | 207,400 |
| fringe benefits lost | 31,100 |
| NET FRONT PAY | $238,500 |

Dr. Battaglia's calculations of front pay losses are from the trial date to plaintiff's retirement at age 65 in 2007 or 10.38 years.

Dr. Pacey assumes that it will take plaintiff two years to obtain other employment, either teaching or as a practicing accountant. Dr. Pacey indicates that plaintiff would be required to take a position similar to the type of position offered to a student coming straight out of college and that it would probably take about two years for plaintiff to find other employment. She projects plaintiff's worklife expectancy to age 70, rather than age 65 as used by Dr. Battaglia, and uses a net discount rate 3% rather than the net discount rate of 2% used by Dr. Battaglia. Pacey deposition Exhibit 1 concludes that plaintiff's front pay losses are $450,000, replacing probable front pay losses assuming plaintiff is not reinstated and assuming plaintiff obtains instructor or private accounting employment. As did Dr. Battaglia, Dr. Pacey also calculates plaintiff's front pay losses using a variety of scenarios, with the result that she finds those losses range from $94,-000 to $450,000 as explained more fully in her deposition testimony, depending upon the parameters used in making the calculations. Counsel for plaintiff contended that, if age 65 is the retirement age used to compute projections of front pay losses, Dr. Pacey's calculations are not significantly different than those prepared by Dr. Battaglia. Counsel suggested that if age 65 is used, the most appropriate forecast assumes that plaintiff will return to and participate in the employment market as a CPA, and will suffer front pay losses in the amount of $238,557.00. In contrast, defendants have argued that it is most likely plaintiff would be able to find other academic employment within a relatively short period of time, probably within no more than one year. They suggest that plaintiff should be awarded front pay losses,

if he is given a two year period to find other academic employment, in the amount of $98,000.

Both expert economists (Pacey and Battaglia) indicated that plaintiff's base salary for 1995–196 was $50,759.00. He received an additional amount for his summer contract, $11,736.00.

### Discussion

■ In a Title VII case asserting violations of a plaintiff's civil rights, "reinstatement is the preferred remedy." *Jackson v. City of Albuquerque*, 890 F.2d 225, (10th Cir.1989), quoting *E.E.O.C. v. Prudential Federal Savings and Loan Ass'n*, 763 F.2d 1166, (10th Cir.1985), *cert. denied*, 474 U.S. 946, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985); *Starrett v. Wadley*, 876 F.2d 808, 824 (10th Cir.1989); *Spulak v. K Mart Corp.*, 894 F.2d 1150, 1157 (10th Cir.1990) (ADEA case); *Anderson v. Phillips Petroleum Co.*, 861 F.2d 631, 637 (10th Cir.1989) (ADEA case); *Lemons v. ICM Mortgage Corp.*, 941 F.2d 1213 (Table) (Unpublished Disposition), Text at 1991 WL 164275, at *2 (10th Cir.1991); *Ziegler v. K–Mart Corp.*, 74 F.3d 1250 (Table) (Unpublished Disposition), Text at 1996 WL 8021, at *6 (10th Cir.1996) ("Under Title VII, the court may award a successful plaintiff any appropriate relief, including reinstatement, back pay or any other equitable relief' the court deems appropriate."); *Shore v. Federal Express Corp.*, 777 F.2d 1155, 1158–1159 (6th Cir.1985) (providing guidelines for determining appropriate front pay); *Gutzwiller v. Fenik*, 860 F.2d 1317 (6th Cir. 1988).

Although reinstatement is the preferred remedy, where it is not feasible, a plaintiff will be entitled to front pay. *Acrey v. American Sheep Industry Assoc.*, 981 F.2d 1569, 1576 (10th Cir.1992); *Spulak*, 894 F.2d at 1157. An order of reinstatement and an award of front pay are mutually exclusive remedies in this circuit. *Anderson v. Phillips Petroleum Co.*, 861 F.2d at 637. Either remedy should be fashioned to make the plaintiff whole or return him as nearly as possible to the economic situation he would have enjoyed but for the defendant's illegal conduct. *Id.* at 638. Reinstatement may not be an appropriate remedy where hostility or animosity between the parties, as a practical matter, makes a productive and amicable working situation possible. *Id.*

One of the essential purposes of Title VII is "to makes persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper v. Moody*, 422 U.S. 405, 418–19, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). Where the legal injury is economic,

> [t]he general rule is, that when a wrong has been done, and the law gives a remedy, the compensation shall be equal to the injury. The latter is the standard by which the former is to be measured. The injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed.

*Id.* at 418–19, 95 S.Ct. at 2372 (quoting *Wicker v. Hoppock*, 73 U.S. (6 Wall.) 94, 99, 18 L.Ed. 752 (1867)). The *Albemarle Paper* Court, in holding that back pay is presumptively due successful Title VII plaintiffs, emphasized congressional intent in fashioning relief under Title VII:

> "The provisions of this subsection are intended to give the courts wide discretion in exercising their equitable powers to fashion the most complete relief possible. In dealing with the present section 706(g) the courts have stressed that the scope of relief under that section of the Act is intended to make the victims of unlawful discrimination whole, and that the attainment of this objective rests not only upon the elimination of the particular unlawful employment practice complained of, but also requires that persons aggrieved by the consequences and effects of the unlawful employment practice be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination."

*Id.* 422 U.S. at 421, 95 S.Ct. at 2373 (quoting 118 Cong.Rec. 7168 (1972) (Section by Section Analysis introduced by Senator Williams to accompany the conference Committee Report on the 1972 Act)). *See also Franks v. Bowman Transportation Co.*, 424 U.S. 747, 774, 96 S.Ct. 1251, 1269,

47 L.Ed.2d 444 (1976); *Patterson v. American Tobacco Co.*, 535 F.2d 257, 269 (4th Cir.1976), *cert. denied*, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1977).

* * * *

Therefore, if the trial court determines that an award of back pay does not fully redress a Title VII plaintiff's injuries, and reinstatement is not possible, an award of front pay is sometimes appropriate in order to effectuate fully the "make whole" purposes of Title VII.

The front pay issue in Title VII litigation is one of first impression for this Circuit. In *Davis v. Combustion Engineering*, 742 F.2d 916, 922–23 (6th Cir.1984), we held front pay to be an appropriate remedy under the Age Discrimination in Employment Act. We echo the Davis court's observation that front pay "does not lend itself to a per se rule.... [I]t must be governed by the sound discretion of the trial court and may not be appropriate in all cases." *Id.* Awards of front pay should be evaluated under the standards applied to all Title VII relief: whether the award will aid in ending illegal discrimination and rectifying the harm it causes. *See Thompson v. Sawyer*, 678 F.2d 257, 259 (D.C.Cir. 1982).

The unique nature of plaintiff's former position renders a calculation of a front pay award in this case particularly difficult. While a district court has considerable experience in calculating future earnings, some basis must appear in the record for such an award. some of the factors which district courts have employed to alleviate the speculative nature of future damages awards include an employee's duty to mitigate, "the availability of employment opportunities, the period within which one by reasonable efforts may be re-employed, the employee's work and life expectancy, the discount tables to determine the present value of future damages and other factors that are pertinent on prospective damages awards." *Koyen v. Consolidated Edison Co.*, 560 F.Supp. 1161, 1168–69 (S.D.N.Y.1983).

The record from the court below contains no indication of the basis for the front pay award. The cut-off date for the award is within the discretion of the district court, *Goss v. Exxon Office Systems, Co.*, 747 F.2d 885 (3d Cir.1984) yet evidence must be submitted from which a reasonable projection can be made. Such an estimation must involve more than mere guesswork. The cost of obtaining a college degree, cited by the plaintiff as a basis for the front pay award, cannot be considered a post-judgment effect of defendant's discrimination. The front pay award is limited to the amount required to place the plaintiff in the position she would have occupied in the absence of discrimination. *Shore v. Federal Express Corp.*, 777 F.2d at 1159–1160.

The Tenth Circuit generally concurs in this analysis. It stated, in *E.E.O.C. v. Prudential Federal Savings and Loan Assoc.*, the following:

Reinstatement may not be appropriate, however, when the employer has exhibited such extreme hostility that, as a practical matter, a productive and amicable working relationship would be impossible.... Under such circumstances, an award of future damages in lieu of reinstatement furthers the remedial purposes of the ADEA by assuring that the aggrieved party is returned as nearly as possible to the economic situation he would have enjoyed but for the defendant's illegal conduct ... If this were not the case, an employer could avoid the purpose of the Act simply by making reinstatement so unattractive and infeasible that the wronged employee would not want to return....

We recognize that future damages have been criticized as uncertain and speculative.... However, given our conclusion that they are available under the ADEA, "[t]he mere fact that damages may be difficult of computation should not exonerate a wrongdoer from liability. The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.' " ... Courts are able to alleviate the uncertainty of future damages by taking into account a discharged employee's duty to mitigate, "the

availability of employment opportunities, the period within which one by reasonable efforts may be re-employed, the employee's work and life expectancy, the discount tables to determine the present value of future damages and other factors that are pertinent on prospective damages awards."

*E.E.O.C. v. Prudential Federal Savings and Loan Assoc.,* 763 F.2d at 1172–1173 (citations omitted)

The Tenth Circuit has also made clear that its views regarding front pay and the purposes to be served by such an award are not "unduly restrictive." *Carter v. Sedgwick County, Kansas,* 36 F.3d 952, 957 (10th Cir. 1994). It continued in that opinion, stating:

"The district court is vested with considerable discretion in formulating remedies for Title VII violations.... However, the exercise of this discretion must be guided by the fact that 'one of the central purposes of Title VII is to make persons whole for injuries suffered on account of unlawful employment discrimination' ", ... We have pointed out that "[i]n general, courts should strive to award the 'most complete relief possible.' " ...

In keeping with the "make whole" nature of the remedies required under Title VII, this court in *Carter II* stated that a district court, when fashioning a front pay award, should ascertain the amount "required to compensate a victim for the continuing future effects of discrimination until the victim can be made whole." ... We therefore directed the court on remand "to determine the time period required in order to make plaintiff whole." ... Ms. Carter argues persuasively that, based on the best records available, the six-month award here of $2,245.50 [the difference between her former and current salary for a six-month period] does not make her whole. Defendants do not dispute this assertion, citing instead to cases from other circuits that do not focus on the required "make whole" nature of Title VII relief. Accordingly, we conclude that the district court abused its discretion in its front pay award because the award does not adequately remedy the effects of defendants' past discrimination as required

by the law and the mandate of *Carter II.* Although we recognized that in *Carter II* we directed the court to set an ending date for front pay based on more than guesswork, we also instructed that the court set a time period sufficient to make plaintiff whole.... Because the court did not do so, we must remand for further proceedings on the calculation of an appropriate award of front pay.

*Carter v. Sedgwick County, Kansas,* 36 F.3d at 957 (citations omitted). *See also Carter v. Sedgwick County. Kansas,* 929 F.2d 1501, 1505 (10th Cir.1991), (remanding for recalculation of front pay award "to reflect plaintiff's earning capacity and to determine the time period required in order to make plaintiff whole. We note that the determination of the appropriate cut-off date for a front pay award is within the district court's discretion, but that the determination must be based on 'more than mere guesswork.' ", and also citing *Shore v. Federal Express Corp.,* 777 F.2d 1155, 1160 (6th Cir.1985)).

This Court has determined that reinstatement in this case is not a feasible alternative. Dr. Thornton himself admitted that he did not trust the administration, relying on the likelihood that his contact with the administration would be limited in his role as a professor at MSCD to state that he did not see that to be a barrier. However, others, including Dr. Kaplan and Dean Brown did express concerns about reinstatement at the college as a remedy. Dr. Parker continues to serve in the primary leadership role in the accounting department. After having had an opportunity to view the parties and observe them during motion hearing and trial, the Court believes that the relationships between the parties are so strained and that so much hostility exists that reinstatement is not a workable alternative. In this case, there appears to be a complete absence of mutual trust which would foster collegial relationships and the ability to participate in collaborative projects that are typical in the academic community. Furthermore, this Court believes, that the actual remedy sought by plaintiff, reinstatement with tenure, would entangle this Court excessively in matters that are left best to academic professionals.

*Gutzwiller v. Fenik,* 860 F.2d 1317, 1333 (6th Cir.1988). Accordingly, the Court will award front pay in lieu of reinstatement as an appropriate remedy in this case.

Thus, the Court must determine what amount of front pay would serve the remedial purposes of Title VII and provide make whole relief to the plaintiff. It is clear that the plaintiff, who has late in life embarked on a second career, will face difficulties in obtaining other comparable academic employment that may not be encountered by recent, younger college graduates. He has little practical accounting experience to rely upon as a selling point to prospective employers and would gain much of his practical, applied experience on the job over a period of years. However, this Court does not discount the experience plaintiff has had teaching. The testimony indicated that teaching accounting involves the application of accounting principles to concrete practical examples. This experience will be valuable and does not place plaintiff in the category of one who has no practical experience whatsoever when coming into the job market.

In considering plaintiff's ability to mitigate his damages, the court may consider the availability of job opportunities and the period within which one by reasonable efforts may be re-employed, in addition to work and life expectancies, and appropriate discount factors. *Shore v. Federal Express Corp.,* 777 F.2d at 1159. Thus, the job market is a factor to be considered. It was clear from the testimony that plaintiff's clear preference was to remain in teaching, whether at MSCD or some other comparable institution. Job openings at comparable institutions in this geographical area appear to be quite limited and it is not likely that plaintiff may compete effectively for academic positions at larger, accredited schools of greater stature. He, most likely, would be able to find employment at other teaching institutions similar to MSCD, in some capacity. Instructors at teaching institutions, according to the evidence received at the hearing, are likely to be paid an amount less than that earned by plaintiff at MSCD.

Other employment prospects that are likely to be available to plaintiff would be in the private sector. The testimony at the hearing indicated that Dr. Thornton's beginning earnings in the private sector would likely be less than in the academic arena, but that with the passage of time his earning capacity would increase significantly more than he would likely earn as a professor or instructor at the end of the same period of time. Dr. Battaglia testified that any front pay losses he calculated used a net discount rate of 2%, which assumes that projected wages will grow 2% less than the overall growth rate. He criticized Dr. Pacey's net discount rate of 4%, indicating that it overstated the growth rate. Dr. Battaglia used a retirement age of 65 in making his computations, which he stated was the normal retirement age generally used by economists. He also made his computations giving plaintiff either one or two years to find other employment. Dr. Pacey used a retirement age of 70, which was consistent with plaintiff's desire to state at MSCD 20 years. It appears that if these two factors are adjusted on Dr. Pacey's computations, the front pay losses calculated are quite similar to those computed by Dr. Battaglia.

The Court has determined that it is most likely plaintiff's realistic employment opportunities, which will allow satisfaction of his duty to mitigate his future damages, will be in the private sector. The front pay losses should be computed using age 65 as the best retirement age. It appears that, when computing such future losses, it is generally accepted in the economic community, age 65 rather than age 70 should be used in making these determinations. The net discount rate of 2% used by Dr. Battaglia will be adopted by this Court, and provides a reasonable mechanism for determining the present value of those future losses. At the hearing, counsel for plaintiff also agreed that if age 65 is used, an appropriate forecast of future losses, assuming that plaintiff returns to the employment market as a CPA, is $238,557.00, the same as calculated by Dr. Battaglia.

This is a reasonable estimate of front pay losses suffered by plaintiff in the circumstances of this case. The plaintiff is older, has little practical experience in the private sector, but has a demonstrated ability to learn and absorb new information. The

Court is not persuaded that plaintiff will be able to obtain other academic employment. Although both experts made calculations using that as one scenario and assuming plaintiff could obtain academic employment, this assumption does not appear to be well-founded in the evidence. The plaintiff expressed a desire to stay in this geographical area. Only four positions were announced in Colorado for 1995–1996; seven for 1996–1997 which included one position at MSCD. Few of those schools are comparable to MSCD.

The best scenario, based on the evidence at the hearing, assumes that plaintiff will most likely be able to obtain employment in the private sector. Thus, the Court will award plaintiff, as front pay, the sum of $238,557.00. This is the difference between his projected future wages at MSCD, $574,236.00, less wages that could be earned from other employment in the private sector, $366,795.00, yielding a difference of $207,441.00, plus 15% for fringe benefits lost, $31,116.00, for total front pay losses in the amount of $238,557.00. This figure uses a retirement age of 65 and an average net discount rate of 2%. This front pay amount provides the "make whole" relief contemplated by Title VII and is an appropriate equitable remedy in this case.

The testimony at the hearing also indicated that, in addition to back pay already awarded by the jury, plaintiff has incurred expenses for medical insurance in the amount of $67.00 as of July 1, 1996. He is also entitled to recover that amount, $67.00 from July 1, 1996 and for each month thereafter (67.00 × 6 months, July–December, 1996, = $402.00). Accordingly, it is therefore

**ORDERED** that plaintiff's request for reinstatement with tenure shall be, and is, **DENIED**. It is further

**ORDERED** that plaintiff shall be, and is, entitled to recover of defendants front pay in the amount of $238,557.00 and shall be entitled to recover $402.00, as and for medical insurance costs in the amount of $67.00 per month from July 1, 1996 through December, 1996.